## SEAVER *vs.* DINGLEY.

The *Stat.* 1821, *ch.* 80, has so far altered the common law, that an action of re-plevin may be maintained for goods unlawfully detained, though the original taking was lawful.

In replevin of goods, the original taking of which by the defendant was lawful, if he plead property in himself, it is not necessary for the plaintiff to prove a demand of the goods previous to suing out the writ of replevin.

Nor is a previous demand of the goods necessary, where the original taking was tortious.

In order to entitle the seller of goods to vacate the sale, and reclaim the goods on the ground of fraud, it is not necessary that the fraudulent representations be made at the time of sale ; as in case of a warranty, which is part of the contract of sale ;—but it is sufficient if the goods be obtained by the influence and means of false and fraudulent representations, though they were made on a previous occasion.

THIS was an action of replevin for goods and merchandize detained in the town of *Gardiner* ; and was tried before *Weston J.* upon the issue of property in the defendant.

It was proved by the plaintiff that on the 9th day of *July* 1824, one *Reed* applied to the house of *Bartels & Baker* in *Portland*, to purchase of them a quantity of goods on credit ; producing at the same time two recommendations, speaking well of him as an active and capable man, but saying nothing of his property ; and that he also referred them to *Gen. McLellan* of *Bath*, then in *Portland*, who spoke of him as a smart, active man.  It was also proved that *Reed* falsely stated to *Bartels & Baker* that he owned one or two farms and a clapboard machine in the town of *Clinton*, where he resided, which were free of incumbrance ;—that he had a considerable quantity of lumber, and other personal property ;—that he was not in debt more than one hundred dollars, and had other means of paying for the goods he wished to purchase, than the proceeds of their sale.  *Bartels & Baker*, confiding in these assurances respecting his property, were thereby induced to give *Reed* credit for goods to the amount of $862, taking his promissory note for that amount, payable in six months. *Reed* then went to *Attwood, Cram & Co.* of whom he obtained goods upon the same false statements.  On the same day he

went to the plantiff's store, where he stated to the chief clerk the same falsehoods, adding that he had obtained credit of *Bartels & Baker*, and of *Attwood, Cram & Co.* and wished to purchase on the same terms of the plaintiff ; and upon those representations, and reference to the merchants before named, the plaintiff's clerk delivered to him goods to the value of $460 on his promissory note at six months.

The counsel for the defendant objected to this evidence, on the ground that the goods in question in this suit were no part of that purchase ; but were bought of the plaintiff by *Reed* in *August* following, on a credit of six months. But the judge overruled the objection.

It was then proved that *Reed* was insolvent, at the time of the false representations before stated; that his real estate and clapboard machine were incumbered with mortgages ; that a part of what he still occupied and improved had been sold by him, and that he was also much involved by other debts, which were secured by mortgage ; that he had frequently been sued ; and that his credit was not good.

Soon after the sale on the 9th of *July*, by the plaintiff's clerk to *Reed*, the plaintiff was made acquainted with what had been transacted by his clerk, and with the representations and facts on which he made the sale ; at which he expressed no dissatisfaction. On the 4th of *August* 1824, *Reed* applied to the plaintiff personally for more goods to make up his assortment, on the same terms ; and being introduced by the principal clerk as the person who had made the previous purchase, the plaintiff sold him goods to the amount of $640, taking his note, on the credit desired. On the 18th of *August*, *Reed* again applied to the same clerk in the absence of the plaintiff, for a further supply of goods on the same credit; stating that his business had been good ; that he had sold his goods faster than he expected, and had been obliged to sell them on credit ; that he had sold to the amount of a thousand dollars in one week ; that his sales had been to very good profit ; and that he intended to make a payment to the plaintiff of $400 before he left town. Upon these representations he obtained the goods which are replevied in this suit, to the

---

---

amount of $437, on a credit of six months. After these goods were selected and laid out, the chief clerk, being about to leave the store, instructed the assistant clerk not to take *Reed's* note for the goods, but to charge them in account ; but on this being afterwards suggested to *Reed*, he declined taking them in that manner; insisting that the purchase was on a credit of six months, and that if they were charged in account, the plaintiff might attach his property for the amount forthwith. Accordingly, upon the return of the chief clerk he assented to the credit proposed, and took *Reed's* note for the amount ; he paying only fifty dollars, instead of the four hundred he had promised. *Reed* received the goods, and shipped them for the *Kennebec*; and on their arrival at *Gardiner*, on the 20th of *August*, they were taken into custody by the defendant, by virtue of an order from *Reed*.

It further appeared that on the day and night of the 18th of *August*, while *Reed* was in *Portland*, his creditors entered his store at *Clinton*, and attached all the property there. While the officer was attaching the property, *Dingley* came with a writ of attachment in trover in his own name, against *Reed*, and requested the officer to make service of it ; but he attached nothing but part of a clapboard machine. It also appeared that *Dingley* arrived at *Reed's* store, which was five miles from his own residence, about sunset ; that an officer was then about the store ; in which there were goods of the estimated value of 1700 dollars ; that when *Dingley* arrived there, attachments had been made to secure debts amounting to less than three hundred dollars ; that he remained there all that night, during which the store was opened with his knowledge, and further attachments made ; that in the course of the night, and the next day, the residue of the goods were delivered by *Reed's* clerk, in payment of sundry debts; that *Dingley* declared to the officer to whom he gave his writ, that he had satisfied *Reed* and his clerk that the property might as well come into his hands, as go to other creditors; that he supposed that *Reed* had gone to *Portland* to get more goods ; and that if he was not able to get property in *Clinton*, he should take another writ and go towards *Portland*.

On the morning of *August* 19th, *Dingley* and his brother sat off for *Portland* to find *Reed* ; whom they met at *Richmond*, and re-

turned with him to *Gardiner* ; where they requested him to se-
cure the defendant in the sum which he claimed to be due, and
which *Reed* declined, wishing the goods at *Portland* again, that he
might return them. *Dingley* replied that if he would not secure
him by the goods, he would go down to *Swan Island*, or *Bath*, or
wherever they might be found, and attach them. The parties
then retired into a private room, and after some conversation
called a witness to their agreement, that *Reed* should sell to the
defendant all his goods on board the vessel at *Gardiner*, amount-
ing to 1500 dollars; that the defendant claimed of him 1200 dol-
lars as a debt then due, the precise amount of which he could
not then ascertain, for want of his papers ; that upon a future
adjustment of their dealings, the balance that might be found due
to *Reed* should be paid to him by a reconveyance of real estate
which he had before conveyed to *Dingley* as security for debts
due to him; but no receipt, obligation, or writing had passed be-
tween them at the time of that conveyance. Hereupon *Reed*
made bills of sale of the goods, and gave to *Dingley* an order on
the master of the vessel, by virtue of which he received and
stored them at *Gardiner*, on their arrival.

One witness testified that he had been formerly solicited by
*Reed* to assume the same responsibility, as his surety, which *Ding-
ley* afterwards assumed, and to take the same security for his
indemnity ; and that *Dingley*, in a conversation with the witness
upon that subject, in *July* 1824, acknowledged that he was fully
secured for a liability he had assumed to *Bênjamin Brown*, for
six hundred dollars ; and that *Reed* since he commenced trading,
which was but a few days before, had paid him off what he owed
him on other accounts. It also appeared that *Reed* had deposited
with *Dingley* about half the goods he had purchased of the plain-
tiff on the fourth of *August*; and that he gave him a bill of sale of
those goods, bearing date *Aug*. 12, in which they were valued at
$572, 35 ; but the defendant offered no proof of payment for
them.

It further appeared that on the 25th day of *August* the plaintiff's
agent, being sent to *Clinton*, stopped at the defendant's store in
*Winslow*,and asked him if he had any goods of *Reed's* in his posses-
sion ; to which he replied in the negative. On being further

asked whether he had in his possession any goods which *Reed* had purchased of the plaintiff, he said he had no goods of *Reed's*, nor any which ever had been his,or which he had obtained in *Portland*, except a cask or two of spirits which he pointed out, then on tap.   The agent, having obtained permission to search his store, then proceeded to the chamber, where he found a large proportion of the goods which *Reed* bought of the plaintiff on the fourth of *August*, packed in the same boxes, and claimed by the defendant as his own; though he had just before assured the agent that the chamber contained nothing but empty casks and boxes.   The writ in this case was issued on the 24th day of *August* ; on which day the replevin bond bears date ; and the plaintiff's agent was accompanied by the officer who had received the writ for service.   · The defendant was fully informed on the 25th of *August* that the plaintiff was in pursuit of the goods which *Reed* had obtained of him ; and that his inquiries were not limited to any particular purchase.   No other demand was made of the goods replevied, than appears in the foregoing transactions.   The officer's *return* was dated *Oct.* 13 ; that being the day on which he served the defendant with a copy of the writ.

When *Dingley* received the goods at *Gardiner* from the master of the vessel, he desired the master to keep it secret from any one who might apply for information ; and he requested the keeper of the store where they were deposited to deny that he had any goods in his store belonging either to him or to *Reed* ; observing that he expected officers from *Hallowell and Augusta* in quest of the goods.   He also obliterated *Reed's* name from the casks and packages, substituting his own.

It further appeared that prior to *July* 9, 1824, *Dingley* had paid or was liable to pay $600 to *Benjamin Brown* for *Reed* ;— that he had received from *Reed*, as part security, a deed of some real estate, which had before been incumbered; and other property to secure the balance ;—and that after the sale of the goods to him at *Gardiner* he, at *Reed's* request, transferred to *Bartels & Baker* all his right in the real estate which had been conveyed to himself.

The counsel for the defendant contended—*first*, that the false representations, made on the 9th of *July*, ought not to have been

received as evidence of fraud on the 18th of *August* following ; and that the plaintiff having given credit to *Reed* on the 4th, and again on the 18th of *August*, without any repetition of the assertions made on the 9th of *July*, the jury ought to be instructed that no fraud was committed on the 18th of *August*. Upon this point the judge instructed the jury that if they were satisfied that *Reed* obtained the goods now in question, on the 18th of *August*, by reason of the false representations made by him on the 9th of *July* preceding ; and that the plaintiff, or his clerk, was not then undeceived with respect to his situation ; the plaintiff, as between him and *Reed*, by reason of the continued fraud practised on him, had a right to vacate the contract of sale, and reclaim the property. But that if it appeared to them that the plaintiff, or his clerk, was then undeceived, and elected, notwithstanding, to give *Reed* a credit, in the hope of getting payment, he could not prevail in this action. And the jury were further instructed, that the plaintiff had the same right, by law, to reclaim the property against *Dingley*, that he had against *Reed* ; unless it appeared that the former had purchased them *bona fide*, of the latter, or had attached them for a debt or debts which had accrued subsequent to *Reed's* purchase.

*Secondly.* It was contended that the goods not having been replevied until the 13th of *October*, the contract was not attempted to be rescinded within a reasonable time ; and that by the delay of the plaintiff, the sale was by law confirmed. But the judge instructed the jury that the plaintiff had not forfeited his rights by any delay apparent in the case.

*Thirdly.* It was objected that the goods were not demanded of the defendant before they were replevied ; and that therefore the action could not be maintained. But this objection the judge overruled.

*Fourthly.* It was insisted that all the evidence relating to the sale of the goods by *Reed* to *Dingley* on the 12th of *August*, and the evidence of what was said and done at the store of the latter on the 24th of *August*, when the goods were replevied, ought not to be received by the court. But the judge admitted this evidence, as tending to shew that the connection between

*Reed* and *Dingley* was collusive and fraudulent against the plaintiff and others, who had been deceived by *Reed.*

*Fifthly.* It was contended that *Dingley* having been summoned as the trustee of *Reed*, at the suit of *Brown & Humphries*, before the goods in this case were replevied, and while they were in *Dingley's* possession, he must be adjudged trustee in that action, and therefore is entitled to retain the goods. But the judge instructed the jury otherwise ; more especially as it appeared that the debt of *Brown & Humphries*, upon which their action was instituted, accrued prior to the time when *Reed* obtained the goods in question.

A verdict was thereupon returned for the plaintiff ; which was taken subject to the opinion of the court upon the points raised at the trial.

*Boutelle*, for the defendant, contended that no proof of false declarations was admissible in evidence, unless they were made at the time of sale ; 2 *Com. on Contr.* 264, 5 ; which, in the present case, was not the fact. If the plaintiff was deceived on the ninth of *July*, he had opportunity to ascertain the truth, before the sale of the goods in *August.* If he neglected this, both the fault and its consequences are his own.

2. The plaintiff, if he was defrauded, has lost his lien on the goods by delay. He should have rescinded the contract, and pursued his remedy, forthwith ; but here was a lapse of fifty six days, before the replevin, which was too late. *Gloucester Bank v. Salem Bank*, 17 *Mass.* 33. *Buffinton v. Gerrish* 15 *Mass.* 156. *Marston v. Baldwin* 17 *Mass.* 606.

3. Here was no demand of the goods. Replevin lies only where trover would lie, for an unlawful detention. 5 *Mass.* 280. The original sale was not void, but voidable merely, and this only against *Reed.* But the defendant, without notice of any fraud, was the innocent bailee of the goods in pledge to secure him against his liability to *Brown.* Hence his possession was lawful, at least until the goods were formally demanded, upon notice of the fraud. 5 *D. & E.* 175. *Badger v. Phinney* 15 *Mass.* 359. *Baker v. Fales* 16 *Mass.* 147.

4. Any evidence, except as to the goods in dispute, was irrelevant and improper. All the exceptions to this rule apply to previous, and not to subsequent transactions ; and this only for the purpose of ascertaining motives. 1 *Phil. Ev.* 139. To admit evidence of other acts, is to surprise the party with testimony which he cannot be supposed to be prepared to meet.

5. He contended that the service of the trustee process operated an attachment of the goods, and fixed the rights of the parties ; entitling the defendant to hold them, until his liability was discharged. 1 *Mass.* 117. *Bissel v. Briggs* 9 *Mass.* 480, 11 *Mass.* 264, 490. *Burlinghame v. Bell* 16 *Mass.* 318.

*Allen* and *Sprague*, for the plaintiffs, replied to the first objection, that the evidence was admissible to shew a fraudulent purpose in *Reed.* Had the action been in *assumpsit*, against him, for false affirmation in the sale of goods, the objection would have force. But it is rather in the nature of case for deceit, in which the proof is not restricted to the time of sale. Yet if it were so, here is evidence of false representations at that time, in the statement that he had sold out his previous purchases, at a good profit, in the ordinary course of trade.

2. If there is a period when the owner of goods thus defrauded must pursue the wrong doer or lose his remedy, it cannot be said to commence before he has knowledge of the fraud. But in the present case the defendant himself was confederate with the cheat, in concealing the goods, obliterating the marks, falsely declaring that he had none of them ; and endeavoring to persuade the store keeper at *Gardiner* to become a party to the same iniquity. The plaintiff replevied the goods as soon as the place of their concealment was discovered.

3. No demand was necessary to be proved, the issue being the naked question of property. If it were otherwise, the case shews a sufficient demand, in the plaintiff's inquiry after the goods, and the defendant's denial that he had any which ever belonged to *Reed.* *Baker v. Fales* 16 *Mass.* 151. The question of a lien in favor of the defendant was not raised at the trial ; nor is it open upon the pleadings ; in which the defendant claims the

absolute property in the goods, and not merely a right, *sub modo*, to retain them. But it is manifest that here was no lien, it having been discharged by the previous delivery of other goods at *Winslow*.

4. As to the trustee process, the defendant cannot be adjudged the trustee of *Reed*, if the finding of the jury in the present case is true ; for it shews that the goods in question were never the property, either of *Reed*, or of the defendant.

*Orr*, in reply, argued that fraud, to vitiate a contract, must be such as was indictable, involving the intent to cheat the party out of his property, by false tokens and representations, out of the reach of detection by the party injured. A naked falsehood is not sufficient ; much less a merely colored statement of the buyer's circumstances, which he has made himself believe to be true.

There being no evidence of indictable fraud, the case stands upon the ground of false affirmation made at the time of sale. But where one is thus defrauded, it is well settled that before he can rescind the contract and reclaim the goods, he should restore all which he has received, and demand his property. But here he has done neither. In felony it is otherwise ; for there the property is not changed. In fraud, the contract is only voidable ; and if the party would avoid it, he must make his election in reasonable time. Here he was alarmed on the 18th of *August*, and put upon his guard ; yet he afterwards ratified the contract, taking a note at six months for the price.

MELLEN C. J. delivered the opinion of the court, at the ensuing term in *Somerset*.

By the report of the judge, the following facts appear. 1. The jury, under his instructions, have decided that the goods replevied, were purchased by *Reed*, of the plaintiff, on the 18th day of *August* 1824, upon a credit of six months ; and that they were so purchased and obtained by means of the false representations made by said *Reed*, on the 9th of *July* preceding;

(at which time he had obtained other goods of the plaintiff in the same manner;) and that at the time of this last purchase, the plaintiff acted under the continued influence of those false representations, not having been undeceived as to their falsehood.   2. That though *Dingley*, a few days afterwards, at *Gardiner*, took possession of said goods under the name of a purchase of them, and received a bill of sale of them from *Reed*; yet that the above transaction was not a *bona fide* sale.   3. That the writ in this action was issued on the 24th of *August* 1824 ; that the replevin bond bore the same date ; and the officer's return of service on the defendant by leaving a copy of the writ, bears date *October* 13, 1824.   4. That the facts relied on as shewing a demand of the goods, took place on the 25th of *August*.   5. That the issue joined was upon the question of property.   One or two other circumstances will be noticed and considered hereafter.   On these facts, the question is whether the decisions and instructions of the presiding judge were correct, or in other words, whether the action is by law maintainable.

The case presents several points, which, in their nature, are preliminary to the consideration of the merits.   1. Is it essential to the maintenance of an action of replevin, that the plaintiff should prove a tortious or unlawful taking of the goods replevied ?   2. If not, is it not necessary for him to prove an unlawful detention of them ?   3. If so, do the facts in this case taken in connection with the declaration and plea, furnish proof of such detention ?

As to the first point.   This has been a subject of much inquiry and learned investigation, in the case of *Badger v. Phinney*, 15 *Mass.* 359 ; and again in *Baker & al. v. Fales* 16 *Mass.* 147 ; and we presume that all or most of the common law principles and authorities are there collected and examined.   As those volumes are in the hands of every lawyer, we refer to those cases ; instead of going through a critical examination of them here, and stating their import and bearing.   The court, in both those causes, after mature consideration, decided, that whatever might be the strict principles of the common law, the statute of 1789, of which our statute of 1821, *ch.* 80, is a transcript, had so altered the common law, that an action of replevin may be maintained in case of

an unlawful detention, though the taking was not tortious and un-lawful. As by these decisions the law was settled in the Com-monwealth of Massachusetts, while Maine was a portion of it, we are not disposed to disturb or question them, even if we enter-tained doubts as to their correctness.

As to the second point, there seems to be no reason for hesi-tation. A part of the charge or declaration in a writ of replevin is that the defendant "unlawfully detains" the goods ; and the two decisions before mentioned were founded on this principle ; and so in fact, are all our actions of replevin ; for, unless in case of detention, a suit would not be necessary, even where there had been a tortious taking. This point has been stated and the question answered, not because involved in any doubt; but merely as introductory to the third point ; and this demands a particular examination ; for if it must be answered in the negative, it must also defeat the present action. What then, is the true answer? What constitutes an "unlawful detention ?" If goods are taken unlawfully, the detention of them is unlawful. As in an action of trover, if the goods were taken illegally, it is a conversion and a demand of the property is not necessary before the commence-ment of the action ; but if the defendant came lawfully into pos-session of the goods, an action cannot be maintained until after demand and refusal, which are evidence of a conversion. For the same reason no action of replevin will lie for goods, of which the defendant lawfully obtained the possession, until after a de-mand. From that time the detention is unlawful, and the case comes within the language of the writ of replevin. But it is not necessary in an action of trover to state in the declaration a de-mand and refusal ; it is matter of proof on the general issue, if such proof is necessary. It is implied and contained in the alle-gation that the defendant unlawfully converted the goods to his own use. Our statute of 1821, *ch.* 63, prescribes the form of a writ of replevin ; and, as before stated, the charge or averment in the declaration is general—that the defendant unlawfully de-tained (the goods) "to this day ;" which averment must be con-sidered as containing, by implication, those facts necessary to ren-der such detention unlawful. In *Buffington & al. v. Gerrish & al.*

Seaver v. Dingley.

15 *Mass.* 156, and in *Cross v. Peters* 1 *Greenl.* 376; both cases of rescinded contract on the alleged ground of fraud by the pur-chasers, it does not appear whether there was any previous de-mand or not ; no question was raised about it.   In the case of *Baker & al. v. Fales,* the writ, as usual, charged the defendant with having, " unlawfully and without any justifiable cause taken the goods, &c. and them unlawfully detained."    The defendant pleaded in abatement, that the goods came lawfully into his pos-session ;   but did not deny the unlawful detention alleged in the writ; and the case, of course, is silent on this point.   In *Badger v. Phinney,* the issue was on the property ;   and in that case a demand was proved before what was considered as the commence-ment of the action ;   though afterwards in *Baker & al. v. Fales,* the court say that the facts in *Badger v. Phinney,* " would have " warranted a decision for the plaintiff, on the ground of the orig-" inal tortious taking under colour of a purchase which was fraud-" ulent."   In the present case the plaintiff, in his writ, makes the allegations required by statute ;   as to his own property in the goods, and the unlawful detention of them by *Dingley*; and the de-fendant pleads in bar of the action property in himself ;   thus waiving all objection as to the regularity of the proceedings on the part of the plaintiff; not denying that he took and detained the goods; but denying that he did either unlawfully; because, as he stated in his plea, the goods were his own.   But the jury have de-cided that the goods were not his; but that his obtainment, posses-sion and detention of them were all fraudulent.   As by the plea of *non cepit,* the question of property is not in issue.   1 *Chitty's Pl.* 490 ;   so, by his plea of property in himself, he did not deny the plaintiff's right to recover the goods, if they, by law, belonged to him, and as the jury have by their finding decided that fact in favor of the plaintiff, we are well satisfied that the defendant cannot now be received to urge the want of a previous demand of the goods, as an objection to the verdict.   We do not perceive why a defendant in replevin, who has no merits, and pretends to none, might not plead in abatement, that the goods replevied came law-fully into his possession, and that he did not unlawfully detain them ;   or he might be more particular, and say that no demand

for the goods had ever been made upon him previous to the commencement of the action.

But there is another point of view in which this preliminary question may be considered. Did the goods replevied ever come lawfully into the possession of *Dingley*. The jury have decided that they were delivered by the plaintiff to *Reed* ; but they have also decided that the delivery was obtained by means of the fraud and falsehood of *Reed*; and that by fraudulent management, *Dingley* procured the goods,and the possession of them from *Reed*. The stream, in every part of it, is poisoned. Can the law pronounce a sale and delivery of goods as fraudulent and void, and allow the vendor at once to rescind it ; and at the same time, say that such delivery and subsequent possession are lawful ? As has been before stated, the court in *Baker & al. v. Fales* say that, a taking under color of a fraudulent purchase, may well be considered as tortious. Reasoning from analogy, we should be conducted to this conclusion. It is a principle of criminal law, perfectly familiar in our courts of justice, that if a person, on contract of hire, obtains the delivery and possession of a horse and chaise from the owner, but with a secret, fraudulent, and felonious intent at the time of hiring, and afterwards runs away with them, this is larceny ; notwithstanding the possession was obtained by the consent of the owner. Can it be that those facts which constitute an infamous crime, in the one case, and subject the offender to punishment in a dungeon, should in the other, constitute a legal defence in a civil action, and ensure him a verdict in his fafor ? This would seem to be a blemish upon the purity, and a reproach upon the impartiality of the law, neither of which it deserves. Viewing the question immediately under consideration, in the several lights in which we have considered it, we are of opinion that this action is legally maintainable without any previous demand of the goods replevied ; and of course it is not necessary for us to examine the facts,which have been reported with a view of shewing such demand, or what could be deemed equivalent. Having thus disposed of this preliminary objection, we now proceed to the consideration of those which have been made to the decisions and instructions of the judge, touching the merits of the cause.

tained by means of the fraud and falsehood; whether at the moment they were practised, or under their continued influence upon the deceived owner of the property ?

The second instruction to the jury, and overruling the objection of the defendant, was, that the plaintiff had not forfeited his right to reclaim the goods by his delay. The objection to this is answered by the fact, that only six days after the sale, the plaintiff purchased his writ of replevin and prepared the proper bond ; and by virtue of this writ the goods were replevied as soon as they were afterwards found at *Gardiner*, viz. on the 13th of *October* following. This objection must fail. The third objection related to the want of proof of a demand, but this point we have already considered.

The fourth objection stated in the report is, that the judge admitted proof of conversations between *Reed* and *Dingley*, as to the sale of goods, on the 12th of *August* ; and also proof of conduct and conversation between the plaintiff's clerk and *Dingley*, on the 24th of *August*. The answer to these objections is very plain; those conversations were the declarations or confessions of the defendant, and so far, were certainly admissible; and although one of those conversations related to a sale of goods, other than those in question in this case; yet as such conversation had a tendency to show, and was offered for the purpose of showing, a collusive understanding between *Reed* and *Dingley*, as to the purchase of goods, we think the evidence was properly admitted. The conversation was only a few days before the fraud was practised on the plaintiff. It is always proper in the trial of an indictment against a person for passing counterfeit money, particularly described in the indictment, to offer proof that the defendant, about the same time, was in possession of, or passed, other counterfeit money though, not charged in the indictment, for the purpose of shewing a *scienter* and criminal intention on the part of the accused.

The fifth and last instruction of the judge complained of, relates to the trustee process. It was contended that as that process was instituted before the commencement of the present action, it ought to be considered as a bar to it. It is difficult to per-

Seaver *v.* Dingley.

The objection that this action was prematurely commenced, cannot be maintained. A fraudulent sale is voidable ; it changes no property, if the vendor, on discovery and proof of the fraud, rescinds the contract, or treats it as a nullity ; and though this is done within the term of credit given, it makes no difference. This same objection was taken and overruled by the court in the above cited case of *Buffington & al. v. Gerrish & al.*

The first instruction of the judge given to the jury, of which the defendant complains, is that which relates to the effect of the false representations made to the plaintiff on the 9th day of *July* preceding, several weeks before the purchase of the goods in question. But upon examination of those instructions, they appear so distinct and guarded as that they could not mislead. He instructed them that if the goods now in dispute were obtained by *Reed* on the 18th of *August*, by reason of the false representations made on the 9th of *July*, and the plaintiff was not then undeceived, nor his clerk, as to the situation of *Reed*; the plaintiff had a right to vacate the contract as between him and *Reed*, by reason of the continued fraud practised on him. The simple question was whether the goods were fraudulently obtained ; not how many days or weeks after the falsehood and fraud were practised on the plaintiff. We perceive nothing incorrect in this direction. The following direction is equally unexceptionable; which was that unless *Dingley* was proved to their satisfaction to have fairly and *bona fide* purchased the goods of *Reed*, the plaintiff's right to vacate the contract was as good and perfect against him as against *Reed*. The defendant's counsel has compared a false and fraudulent representation to a warranty ; which, to be binding, must be made at the time of the sale, or upon the sale. Such is the law as to a warranty, because it is a part of the contract of sale ; but the false and fraudulent representations by means of which a man gains an undeserved credit, and obtains possession of property under the name and colour of a purchase, must from the nature of the thing precede the sale, because the sale is made in consequence of them. The time of the false and fraudulent representation is not of so much importance ; the main question always is, were the credit and the possession of the property ob-

Seaver *v.* Dingley.

ceive how the question of property, which was the only one in trial before the jury, could possibly be affected by the pendency of the trustee action. But if, by any form of pleading, the question had been brought before us, as to the effect of that process on this action, the answer to the defendant's objection is very plain and obvious. As it now appears by the verdict of the jury that the property of the goods replevied is in the plaintiff; it is very clear that he has no interest in the question whether *Dingley* is the trustee of *Reed* or not; nor can he be affected by the decision of that cause whatever it may be. If *Dingley* stood indebted to *Reed* on account, or otherwise, except on a negotiable security, at the time of the service of the trustee process, he will be adjudged trustee. But if the object of the plaintiffs in that action is to charge him as trustee in virtue of having the goods in possession then, which are now the subject of this suit, he may disclose the fact, that the verdict and judgment in this action have established the property of those goods to be, and to have been, in the plaintiff *Seaver*; and then he must, of course, be discharged. But, it is unnecessary to pursue this idea any further.

It has been further urged in the argument that the defendant had a lien on the property, which, as pawnee, he had a legal right to maintain, notwithstanding the circumstances under which it was procured by *Reed*; and some authorities have been relied on in support of this position; but the position itself is not sustained by the facts of the case. The bill of sale to *Dingley* was absolute, and he always claimed the property as owner, and in no other character, and the jury have decided against his claim, and by their verdict, involved him in the consequences of *Reed's* fraud, equally with *Reed* himself.

On view of all the facts of the case, the court are of opinion that the law is clearly with the plaintiff; and accordingly there must be

*Judgment on the verdict.*